We'll move to argument next in No. 21-1125, Roe v. St. John's University. No. 21-1125, Roe v. St. John's University Good morning, Your Honors. My name is Peter Eikenberry. I represent the appellate Richard Roe. Mr. Roe was found in violation of St. John's procedures, first in a dull matter. And we argue, I think, pretty extensively that there was no intent that was present because it only said that he participated in physical contact. Mr. Eikenberry, can I ask you a question, please? Of course, Judge Sack. I think it's appropriate, but read through the papers, and there's something that seems to be hovering over this. That is to say, it seems to me it looks like there is a very clear, assuming the facts are as you portray them, it's a very clear defamation case here with respect to the tweet. If the tweet is, the main tweet here, is false, it's a straightforward defamation case. Admittedly, I don't know whether there's jurisdiction in this court, but it's a defamation case. Instead, it comes here as a Title IX case. And that makes me kind of wonder whether there's, behind all of this, there's some jurisprudential or social issue here that you want the court to take on rather than just the question of the tweet, the injury of the tweet.  Your Honor, but for the tweet and the tweet storm in January 4th, Mr. Rowe would have probably sucked it up on the fact that he was able to get back in school. By now he would probably be finishing law school, and he would have gone on with his life. But this terrible thing happened on the 4th of January. There was a tweet storm where 2,000 women, presumably, stated that St. John's didn't treat women very well when they made complaints against men. And in that tweet storm was a tweet that said one of the ways that St. John's didn't do a great job is to have somebody raped one of these women, and he only got a half-a-semester suspension. I'd like to read a little bit from the beautiful opinion by Judge Cabranes in the Menneker case. Well, what you're going to say from the Menneker case is that when there is pressure on a university to deal with male sexual assault, that that's evidence of gender bias, right? That's true. I am going to say that. But, of course, in the Doe case, that disposition happened before the tweet storm, right? Yes, it did. So your argument about the Doe case is that Mr. Roe's allegations are that Doe took his hand and put his hand on her chest, at which time he removed his hand and said, I'm not interested in doing this. And then St. John's, on the basis of that admission, found that he was responsible for nonconsensual sexual contact. Is that right? That's correct. So then your argument for that incident is the kind of nonsensical character of that result is evidence of bias. Is that right? The panel, that particular panel, decided that his unintentional participation in sexual contact was a violation, whereas the St. John's rules, we say, has to be intentional. But in Medicare and these other cases, usually when we find a kind of bias proceeding, it's because the evidence points in one direction, and yet the panel decides in the other direction. In this kind of case, you're sort of saying that the disposition inherently was contradictory because they're relying on his admission, and his only admission is that he engaged in unintentional touching and then withdrew, and that indicates bias. Yes. Does it indicate bias because of sex? Yes, I think so. In the Medicare case, they say that the thing involves sex. And here we have a person that's favored, even though she was the one that violated the rule, but he was the one that got punished. Right. So I guess in Medicare, there's the accusation that was alleged to be false in that case as well. And the court says Kaplan didn't accuse Medicare of just any misconduct. She accused him of sexual misconduct. That choice is significant and suggests that Medicare is sex-related partner allegations. So is your position that because he's being accused falsely under the allegations of sexual misconduct, that that is discrimination on the basis of sex? Right. But, Your Honor, I would, with all due respect, I would like to go forward with the tweet storm and the false tweet. Okay. In the Medicare case, the judge talks about malicious, if you give credit to malicious allegations. And here we have a malicious allegation, and St. John's had two choices, essentially. They could correct the malicious allegation, but here we have the poster boy, the rapist, walking around on campus. They could correct that allegation, that malicious thing, or they could get rid of him. And so what do they do? The day the newspaper comes out, that very day, they suspend him from the university as the day before they gave him the chance to walk around. And the second thing they did, they came down and they denied his appeal. And the denial of the appeal was clearly irregular because the judge, Professor Cunningham, said wrongfully, falsely, that he had done this terrible thing to her in the hotel room, in the room when she was asleep. That was not the finding of the Smith appeal body. And then we go forward with the Smith proceeding, and during the Smith proceeding, they never corrected the tweet. They had this outside lawyer participating in the deliberations, and they then, on the Smith. What was wrong with the outside lawyer participating? Because the St. John's rules say there has to be impartial proceeding, and the only people that are able to participate in that proceeding are members of the faculty and administrators. Why does the fact that there's a lawyer there have anything to do with it? If he's a lawyer participating in the deliberations, which are supposed to be private. Because under the policy, Mr. Rowe was not allowed to have a lawyer participating, right? Mr. Rowe was allowed to have a lawyer as an advocate, but as far as the deliberations in private, the outside lawyer being there is a terrible thing. That's not due process. That's not impartial. What was the outside lawyer doing? He was participating in the deliberations. He chaired it, and he was a member of the panel who found a violation of Smith. And then the worst thing that happened, Your Honor, which I'm going to have to get to, is that when the appeal came down on the 15th of January of 2020, the guy who wrote the appeal was the same guy, Cunningham, who had written the appeal back when on the Hearst case. And he says that Joe was found guilty of digital penetration, which is false. And if you read the brief, even St. John's brief on page 9 agrees that there was no finding of digital penetration. So as the whole proceeding... Sorry, when does he say that he was found guilty of the penetration? In a brief on page—in the appeal brief on the first page? No, that's when St. John's acknowledges that he wasn't found responsible for the penetration. Right. But you're saying in the proceeding... When Mr. Rowe appeals, they say—and he's saying where the facts were—the facts were that there was digital penetration. That was a false statement. I see. False. Throughout this proceeding, for a whole year, starting with one appeal proceeding and ending with the other proceeding, there are false statements before the court. I'm asking you, Your Honors, today, where were the lawyers here? Why were the lawyers not— Just to fit it into our case law, which says that there needs to be some kind of procedural irregularity coupled with the pressure. Yes. At least that's one theory. Yes. The procedural irregularities are you're saying there was the immediate suspension after the tweet storm. Yes. That he wasn't informed of the charges for a long time. At the hearing, there was an outside lawyer participating, which you say is irregular. Yes. And there were false statements that were made. False statements in the appeal proceedings on both things. And so your argument—so you said with respect to the Doe incident, your argument was that the outcome, the disposition is kind of contradictory in itself. With respect to this other, the Smith proceeding, you're saying there are these procedural irregularities, and it happened in the wake of this public pressure against the university. Yes, because it was the next—the very same day that the article came out from the student newspaper about the tweet storm, is that is the day he was suspended. That is the very day that the appeal came down and said that he had done these terrible things to a woman when she was asleep in her bed, which was false. So he had two false opinions as part of his irregular procedures. And I—if that is not irregularity, why— And it's a false statement because when they say that he did something while she was unconscious, but the decision, the earlier decision of St. John's was that he had admitted to the conduct, and he never admitted to doing anything to someone. Absolutely. He did not do anything. Then there's a contradiction there as well. Yes. I see. So from beginning to end, there was poor lawyering by the—the outside lawyer participated in both proceedings and helped on the deliberations. They never corrected the false tweet. And at the beginning—and they suspended him immediately after the article. There was more than some pressure from the publicity. And how does this get us to—how do you bring this to Title IX to it being a violation of Title IX? Your Honor, I'm sorry. I'm kind of— I don't blame you. How do you get, from your description of the malfeasance of St. John, how do you get to Title IX a violation of Title IX? Well, Your Honor, there's not clear irregularities in all of his proceedings with these false statements made in the appeals and these attorneys participating in the deliberations when he's not entitled to. They have their outside attorney in a process— I don't think that your answer to Judge Sack would be pretty straightforward, which is that in Menneker and in the Columbia case, we said that if there are procedural irregularities and also pressure, public pressure on a university to respond more vigorously to complaints of sexual misconduct— As a reason— We said that states a claim under Title IX. We've said that before. It is, right, as far as some pressure from the—according to Menneker, it only has to be some. Or minimal, in fact, we said. Yeah, minimal. And so then all these irregularities happen on the very day that the news comes out about the tweet storm. And this guy's walking around on campus, and he's a rapist. Why would he not be—why wouldn't he be cleared of being a rapist? Or else, wouldn't they want to get rid of him? They chose the easy way out. Well, you have a different argument, which I thought you were also saying that he had reported that as an incident of sexual harassment and that the university failed to investigate. Is that— Well, yeah, but— But no, your claim now seems to be more that it shows a motivation or a bias to get him off campus. Judge Menache, how much time do I have here today? Well, I'll let you get to that question, and then— So I'm not abandoning any part of my briefs. I'm just saying there's only so much time I have before this court, and I can't cover everything. Okay, so I get it. So you're making both of those arguments. That's fair. Yeah. Okay, Mr. Eikenberry, so you've reserved some time for rebuttals. We'll hear from you again. I appreciate it. But let's hear first from the appellee, Mr. Zuckerman. Good morning, Your Honors. Lyle Zuckerman from Davis Retromaine. On behalf of the defendant, Appellee St. John's University, may it please the court. There's a lot to unpack there. To start with, there is no evidence, there is no allegation that's plausible of a procedural violation anywhere in the record. None. Zero. Among other things. Well, what about the argument that we were just talking about, which is his allegations, and we accept his allegations. We're throwing a motion to dismiss. So his allegations are that he was invited back to Doe's room. She took his hand and put it on her chest, at which time he removed his hand and said, I'm not interested in doing that. And then the university says, well, he admitted that he engaged in nonconsensual sexual conduct. But his admission was to unintentional sexual conduct. She was the one who was acting intentionally. So doesn't that outcome just look like a very questionable result that might be the product of bias?  The first is, that's a straw man that's been erected here. The conduct board did not say that the only evidence upon which we have made our decision is Roe's admission. In fact, there were four charges filed against Roe. They found not in violation on three. They used credibility as a determining factor, among other things. The fact that he admitted, unlike in the Smith case, the fact that Roe admitted in the Doe case that there was contact is all that they were citing to. There was no dispute of contact. So you're saying that we should understand the letter to mean he admitted there was contact, and we found that the contact was more than what he admitted to? Not more. Completely different. Because their accounts of this encounter are- The conduct board says, The respondent admitted in engaging in physical contact of a sexual nature with a complainant, and the evidence demonstrated a lack of affirmative consent to engage in such contact. Referring to the contact he admitted to engaging in. Such evidence included the complainant's intoxication as described by multiple witnesses, the respondent's assertion which was not disputed that he was not impaired by alcohol. And, in fact, the district court accepted that. The district court said, even accepting Roe's allegations, the university must have found that even though she took his hand and put it on herself, that because she was intoxicated, she couldn't have done so consensually, and that was the basis of the liability. Isn't that what the district court said, even? The district, the paragraph I think Your Honor is recalling is really, it's pure dicta. And it's not relevant to the inquiry here, because Mr. Roe would have to prove or allege, plausibly allege, that not only was it an erroneous outcome, but that the evidence strongly favored him. And I think what this panel was saying, the conduct board, that is, is that the evidence clearly didn't strongly favor him, because it was undisputed they were together. It was undisputed he was not intoxicated. It was undisputed she was intoxicated. And it was undisputed that there was this sexualized contact. The only thing that was disputed was who initiated the contact. And the conduct board has the obligation to make determinations of credibility, and it did. I predict that maybe that that will turn out to be what the result is, that it's not, his version of events is not accurate. But we're on a motion to dismiss, and we have to accept his allegations at this point, right? Well, not when there's documents that were submitted by the plaintiff, reams and reams of documents that were cherry picked from the record. And so we were entitled in a motion, 12B6, to put in the rest of the record, so that the plaintiff can't just cherry pick it. And what is in there demonstrates, I think- Is there a point at which the conduct board said, even though we reference his admission to engaging in physical contact, we think that the physical contact was different than what he admitted to? Not in the decision itself. It has no obligation in the conduct board to issue any written decision at all. It's not like an arbitration or other quasi-judicial proceedings. I'm not saying it has to. I'm just saying that it's a motion to dismiss. I have his allegations. I don't have anything in the record that indicates that the conduct board was not relying on his admission. In fact, the record seems to suggest it was relying on his admission. And so that's why it seems like an odd result. Well, we do have something in the record that we put into the record. It was one of the many documents Judge Chen rejected, and we think improperly, which is Exhibit F to the Hurwit Affidavit. That is the handwritten underlying decision by the conduct board, which Mr. Rowe and his attorney had access to if they requested it. And it was the basis upon which the conduct board's decision was issued. But now you're saying that there's some other document that the district court decided it couldn't consider on a motion to dismiss that would show that Mr. Rowe's version of events was not accurate. But doesn't that argument suggest that this shouldn't be decided on a motion to dismiss and we should look at that document in order to decide the question on summary judgment or in some later stage of the proceedings? I think no for two reasons, Your Honor. The first is we think the document ought to come in because it was Mr. Rowe who put this entire issue into dispute and placed these documents into dispute. But beyond that, it is beyond inferred that the conduct board was assessing issues of credibility. That's what they do. There was no way to reconcile these two accounts. Someone was telling the truth. I get that you're saying now that actually the conduct board did not rely on his admission. But can I just ask a question? Solely. Hypothetically, if in fact the disposition was the way I think the district court described it, which was he admitted that she took his hand, put it on herself, and then he said, no, I'm not interested. And on the basis of that admission, there's a finding that he's responsible for nonconsensual sexual contact. That would be an inexplicable result and that might indicate bias. I would say that. You're saying that's not what happened here. I understand the question. But I'm saying like if that were the version of events, would that? If that was the version of events, Rowe's conduct would not violate policy 703 at the university. It would be no different than if I intoxicated. Sorry. Do we know what that is? We'll preserve your time. No worries. It's OK. OK, why don't you continue? Sorry about that. That's OK. I think I was agreeing with Your Honor that if those were the undisputed facts, there's no question that would not, Mr. Rowe's conduct would not have violated policy 703. In fact, perhaps she would have been in violation of policy 703. But that's not what the conduct board determined. And it made a very, there is no way, as I said, to reconcile the two narratives. It shows one story over the other. It shows her story. That does not evidence sex discrimination. It just doesn't. And he has to, Rowe has to come forward with evidence of actual gender bias. So the district court says, the conduct board found that Planoff admitted that he and Doe had engaged in sexual contact. And even though Planoff told SJU's investigator that Doe had initiated that contact, the conduct board concluded that Doe was unable to affirmatively consent to the contact due to her intoxication. In other words, even assuming that the conduct board accepted Planoff's account of the events, i.e. that Doe had placed Planoff's hand on Doe's breast, the board found that Doe did not and could not have done so knowingly and voluntarily due to intoxication that Planoff was not impaired by alcohol, would have known that. Right? So the district court says the opposite of what you just said. The district court seems to think that the conduct board, if it had accepted his version of events, would have properly, in fact, might have properly found responsibility. Let's assume that's true, Your Honor, just for the sake of argument. It is not the province of the district court to sit as an appeal board for the student conduct board. It's the only proper role of the courts is to— I agree with that. But the district court does have a role in deciding whether the allegations give rise to an inference of bias. And you've just told me that if the facts were as he alleges in his complaint, and that was the admission that he made and that was the basis of the liability finding, it would not violate the sexual misconduct policy of St. John's University. So that suggests that if the facts are as he alleges in the complaint, he's found responsible for conduct that does not violate the sexual misconduct policy. And so that leads to an inference that it was a biased result, right? No. First of all, the complaint is not just the four corners of the complaint. He put in all these documents, and we have completed the record with those documents, almost completed the record. So when the court's looking at what is the plausible allegations that are pled, it has to look at all the documents here, including the decision of the conduct board. But it could mean there was an error. It doesn't mean it was infected by gender bias. There's no other allegation of gender bias. There's no comments about gender bias. He wasn't precluded from presenting witnesses. He is not entitled to an attorney, yet he was provided the opportunity to have his attorney at these proceedings. He has the ability to cross-examine witnesses. The conduct board found him not in violation of three of four of the counts in the Doe matter. And even if Your Honor is correct about everything to date, there is nothing to suggest that he still wouldn't have been expelled after the Mary Smith incident, in which there is no allegation of an inappropriate outcome. In fact, that conduct board specifically. I don't know if that's true, although it does seem like the university did say that expulsion was appropriate as a remedy because he had already been found responsible for prior incidents. So there at least is a possibility that he would not have been expelled if there was only one other incident. But let's talk about that other incident. Okay, so Mr. Eikenberry suggested that there were these procedural irregularities, that he was immediately suspended after having received the no-contact order, that he didn't receive notice of the allegations for a long time, that there were some misstatements about what he was found responsible for in the prior proceeding, and that that occurred in the context of the tweet storm, which is the pressure on the university. So why doesn't that meet the requirements in Maneker that say that when you have procedural irregularities and some pressure on a university to deal more vigorously with complaints of sexual assault, that it allows somebody to state a Title IX claim? First of all, in Maneker what the court held was that the university in that situation, quote, entirely disregarded its investigation process. There's not a scintilla of evidence that St. John's deviated from its investigation process in the slight. But with respect to the minimal showing in regards to the tweet, the court held that there still has to be a procedural irregularity when there is a minimal amount of publicity. That's what happened here. This isn't like Doe versus Columbia where the New York Post was all over it, where President Bollinger had to call a meeting of the entire university to quell the riots. There was nothing going on here. There was a student newspaper article. That's it. And a couple of tweets. That's it. Well, Maneker actually says that the – Maneker says, construing Doe versus Columbia, says it would be erroneous to say that there needs to be that level of public scrutiny, right? Maneker says even minimal pressure would be sufficient, right? Yes, but it says two other things, Your Honor. The first is that having the press – and they don't mean a student newspaper, they mean like the New York Post – that that alone does not create an inference of gender discrimination. And secondly, even if you have a minimal amount of publicity, you still need a clearly irregular procedural process. There is no procedural irregularity here. None. That attorney is hired by St. John's for the exact reason that this court would want the attorney to be hired by St. John's, to ensure that the process and the procedures are fulfilled at every step of the way. And that's exactly what he did here. So St. John's hires an outside attorney to run the procedures, but the participants, the respondent and the complainant, don't get to have an attorney who participates in the proceedings. Is that right? That's correct. That's not guaranteed by the procedure, but in this case, Mr. Rowe did have his attorney present at every stage of this thing. Well, an attorney is allowed to be present but not to participate in the procedure. Oh, not as an advocate. That's correct. Not as an advocate. No, 100 percent. So he could advise him separately and maybe could witness the procedure separately. Yes. But he can't participate in the procedure. Not as an advocate. That's correct. So you're saying that the outside attorney was not – that was not irregular. What about the immediate suspension after he had notified the prior business day that he could continue to stay on campus but with a no-contact order? Not irregular either. The procedure provides for, and as Your Honor is aware, Title IX permits, interim measures to be taken in the face of a complaint. This was now the second complaint against this individual. He had been convicted of the first one. But didn't St. John's respond to the complaint by issuing the no-contact order and then only after this article came out did they suspend him? Like he got a no-contact order that said you can't have contact with Smith, right, but you can remain on campus. And then the article comes out, and then he gets a suspension. Well, the tweet was January 4th, right, of 2019. The no-contact order was on January 7th. Right. I don't have the date. Then on January 8th, there is the Torch article, which is the student newspaper reporting on the tweet storm. And then he's suspended. So the day before, he had received a no-contact order, which was the interim measure for the complaint. But then the article comes out, and then he's suspended. Well, just because they didn't— So doesn't that suggest that they changed their mind about what the interim measure should be? No. I mean, sometimes there is the initial—when there's a complaint with respect to a sexual encounter, the initial reaction is always a no-contact order. Then once you look at the full complaint and think about it a little bit, then sometimes you want to increase the protective— So you're saying on January 7th, they issued the no-contact order just because a complaint had been submitted without analyzing the complaint. But by the next day, they had analyzed the complaint and decided that a suspension was warranted. Yes, Your Honor. Okay. What about the misstatements that he says, that there were statements that he had been found responsible for a digital penetration when, in fact, he had been found not responsible? If Your Honors look at the appeal decision in the Smith case, which is what led to the expulsion, there is one misstatement in the introduction of it that was not a fact upon which Mr. Cunningham says that the appeal board made its determination. With respect to the appropriateness of the sanction, that is, it relied on only a couple of things. That Mr. Rowe had twice been found in violation, and in both instances, the victim was unconscious. That was it. There's no reference to digital penetration. That's only in an intro paragraph setting some background. That's not the basis of the findings, and that's not the basis of the finding in isolation. Can I ask about the victim being unconscious? So that is inconsistent with his allegations in his complaint, that the victim would have been unconscious. But you're telling me that we should understand the conduct board's finding in the earlier proceeding not to rely on his allegations or his admission, but that they had, in fact, found that the victim was unconscious. The record before the district court on the Rule 12b-6 reflects that there was enough evidence for the conduct board to make a determination. The district court excluded the documents that you think are necessary to determine that the conduct board reached that conclusion. One of the documents, that's correct, and we're asking your honors to – What in the record right now reflects the conduct board's determination that the victim, that Doe, had been unconscious when the conduct occurred? Well, the appeal decision does, and that's in the record. The appeal decision that I had read before that says you admitted to contact. But you have to read between the lines of that to say you admitted to contact, and we think the contact was different than what you admitted to. Like, that is an inference. Well, there's no – You have to draw. There's no – yes. The district court drew the opposite inference, which was even if they just relied on his admitted contact, right? Well, let me answer your first question first, your honor, which is – the answer to your first question is yes, because there is no way to reconcile the two narratives. The conduct board had to either believe Mr. Rowe or believe Ms. Doe.  And so it's in between, because as you pointed out a moment ago, Ms. Doe had alleged four different nonconsensual sexual contact, including penetration. And as you said, the conduct board found him not responsible of three of them. So they certainly didn't adopt Doe's version of events fully. Well, not fully, but they could not have convicted – they obviously found that he did not – that she did not grab his hand. And against his will, and he was unable to resist the thrusting of his own hand upon her closed breast, as the opposing counsel narrates. And then – I guess it doesn't say it in the complaint – he must have somehow ripped his hand away and then said I don't want to have sex with you and left. They obviously did not believe that version of the events. There was no other way to convict. They obviously didn't believe that version of events because you think that finding him responsible based on that version of events would not have been consistent with the misconduct policy. Could you repeat that, your honor? You're saying that they obviously didn't find that version of events because it would not make any sense to find him responsible. Correct. It would not have violated policy 703. Correct. But I think you agreed with me a moment ago that the district court did say that even if that's the version of events, the university properly found him responsible. It's dicta. The court did say that. That's not the position I have before your honors. Okay. I appreciate that. Thank you, Mr. Zuckerman, for taking you beyond your time with your other questions. Thank you. Thank you to the court. Thank you very much. We'll hear back from Mr. Eikenberry on rebuttal. Your honor, I'm sorry. In the Doe proceeding, the panel seemed to make much of the fact that Doe was intoxicated. But the rules say that if you're intoxicated and you take somebody's hand and put it on your sexual part, that's a violation by you. Her intoxication. Right. And I think Mr. Zuckerman actually agreed with that, that if, in fact, the events were as Mr. Rowe alleges in his complaint, and that was with his admission, the university would have no basis for finding him responsible of nonconsensual sexual contact. But what he's saying is that we should understand the record as the conduct board making a different determination that the facts were other than Mr. Rowe's allegations. How do you respond to that? Well, your honor, when we have a chance to have a deposition, we'll know what the hell the truth was here. His version has to be accepted right here. And I think the court below pretty much relied on her intoxication for its finding. And I also want to talk about bias. Right, so this is right. So the district court said even if those are the events that happened, as Mr. Rowe alleges, it still would have been an assault by Mr. Rowe because she was intoxicated. Is that correct? Yeah, that's right. And that's just wrong. And Mr. Zuckerman characterizes that as dicta. So should we understand that as not being necessary to the district court's decision? Well, I think it indicates what the basis of the decision was. And as to the fact that there was no irregularities, Mr. Professor Cunningham has irregularities all over the place when he misstates what the facts were. He misstates the facts on the day of the article coming out talking about the tweet storm. And they never corrected the malicious tweet. They never corrected it. That's also irregular procedure. And these procedures are set down by St. John's. And we have an outside counsel who knows what the procedures are, and he nevertheless in both proceeding, he sits there, takes part of the deliberations. Well, I mean, as Mr. Zuckerman just said, St. John's hires an attorney to help conduct the proceeding. Fine. Do we know that that's irregular if they do that regularly in these kinds of proceedings? Why can't they hire an attorney to make sure the proceedings are okay? But he's under their rules. He's not permitted to sit on the private deliberations of the panel, and he's not permitted to be a member of the panel. And he did that both times. You're saying because the rules say that the panel has to be constituted by regular faculty members or something like that? Right. Yes. And you're saying that that's what the policy says? That's one of the policies that was violated, yes. Okay. And the bias was demonstrated by the professor. When he says things wrong, like he makes a wrong decision that the panel found digital penetration, he does that in his opinion. He does the other time, which even the briefs of St. John's say that the first finding had to do with attack in Paris when she was asleep. That's not true. That's not what the panel found out. So there's a lot of things here where we don't have really good lawyering. I'm a lawyer. I care a lot about this profession. Their dishonesty from beginning to end, especially with Mr. Cunningham and especially in Mr. Foley violating the procedures, and especially when some strong lawyer should come in and say we have to correct this tweet. Okay. There's bias, bias, bias. Well, thank you very much, Mr. Eikenberry. The case is submitted. Thank you very much. I appreciate it. We'll move next to argument in. Ms. Carty. Good morning, Your Honors. I am Dawn Carty, and I represent Mr. Richard Sterrett. This case is not a presumption case. There is no violence in this case. There are no drugs in this case. There are allegations of fraud. This is a case where bail should be presumed to be appropriate. This court has said it is only under a limited group of offenders who should be denied bail pending appeal. Well, just to clarify, you didn't appeal the actual order denying bail. You filed a later motion, which you said was a motion to reconsider the first bail decision. So is that effectively a motion to reopen the bail proceedings? No. It's a motion to re-argue because I was not the original attorney on the matter. The original attorney on the matter, Mr. DiChiara, filed a bail motion. But he filed that bail motion without all of the supportive documentation that I, as I was assigned. There was an original bail motion and an order denying bail, and then you came along later and asked to reconsider it. That's correct. And we have a procedure for reopening the bail proceedings, right? Right. Usually you'd have to show that there's a change in material circumstances. Correct. And do you think that you meet that standard here? I do. Absolutely. So what are the changed circumstances that would justify reopening the bail proceedings? I think the changed circumstances were multifold. One was that the issue regarding his medical condition really spoke to both his ability to flee, for example, and whether or not he could be a danger to the community. His multiple serious medical conditions, which cannot be treated by the Metropolitan Detention Center, and having done this for 40 years, I can assure you that if Mr. Sterritt has a heart attack, it's very unlikely that he is going to survive because he will never get the kind of emergency treatment that is necessary. You can see that he is 65 years old. He's had his colon removed. He has a big lump on his chest. He suffers from diabetes. He suffers from high blood pressure. He suffers from all types of ailments that are serious and need medical attention, and he's not getting that medical attention. In addition to that, those serious medical conditions really do keep him from being any risk of flight. It is highly unlikely that Mr. Sterritt is going to be out there fleeing. And quite frankly, the government has shown no actual resource for him to flee, no money for him to flee. I mean, every one of the other defendants in this case are out on bail, charged with the very same huge fraud that Mr. Sterritt is charged on. And I believe, Your Honor, that we have presented a combination of conditions that would assure the court that Mr. Sterritt could not flee and would not be a danger to the community. The only thing that we discovered as we were going through our, and believe me, we're not even near through reviewing discovery in this case, was that there was a conversation from a confidential source of the government. They were the ones who brought up the idea of some submarine off in international waters. There was a confidential source conversation, I believe it's the very same conversation, where that confidential source says, let's go to Costa Rica. No proof of going to Costa Rica. No proof of going out on international waters. And last but not least, the confidential source says, oh, maybe we can hide the money in kilos. And that's when Mr. Richard Sterritt, on their own saying, says, absolutely not. So that's the, in thousands and thousands and thousands of phone calls, conversations, this little piece of evidence is supposed to suggest that my client has a risk of flight? I mean, respectfully, I do think that it was an abuse of discretion, and it is clear error to have kept Mr. Sterritt incarcerated on bail. What could, the package makes enormous sense. First of all, he doesn't have to be on the Internet. I have cases where my clients are prohibited from the Internet. He doesn't even have to have a cell phone. He can be required to- Okay, Ms. Berry, I think we understand that. Okay. You've reserved time for rebuttal, so we'll hear from you again, but let's hear first from the government. Mr. Axelrod. Good morning, Your Honor. Nick Axelrod on behalf of the government, and I also represented the government in some of the proceedings below. The District Court did not clearly err when it found that the defendant's medical treatment at the MDC was not material, material to the issue of bail, because it did not mitigate the well-established risk of flight and dangerousness in this case. Richard Sterritt is a serial fraudster who was not deterred by the SEC's efforts to halt trading on two separate occasions, separate trading in two public companies, who bragged in a recorded phone call about how he had evaded his probation officer's surveillance in connection with his prior securities fraud conviction, and who orchestrated a market manipulation scheme that requires really little more than a cell phone and Internet access. In seeking to reopen bail, which is, Your Honor, Judge Monashi, that is what they were seeking to do. In seeking to reopen bail, the defendant proposed that he be released to live with his alien 88-year-old mother in substantially the same circumstances in which he was living when he committed the charged offenses, and secured only by a $100,000 personal recognizance bond. What did he point to? He did not point to a new medical condition. He did not point to anything in his medical records that shows a meaningful deterioration in his condition. And this is not a case— But there was a lot more extensive documentation of the extent of his medical conditions, right? Respectfully, Your Honor, I think the thrust of the conditions was available, and the district court actually mentioned it at the May bail hearing. That's A, 133, and then again at 137 and 138. Mr. DiChiara had brought to the court's attention his heart conditions, which are the primary conditions that he complained about, the primary conditions in dispute. And they were also discussed at the bail hearing in Texas. There was a very robust record to these things. He didn't point—you know, sometimes we see bail decisions or reopening motions where there's been discovery and the defense says, well, what the district court was told about the charged offenses, what the indictment said, really makes it look worse than it was. And here's why he's not as much of a risk. None of that is the case here. That's not this case. The government's evidence is overwhelming, and there hasn't been a dispute in the papers before the court about that. What he pointed to was a series of incidents in which there was a disagreement between the defendant and his doctors over whether he needed to go to the hospital. And the district court looked at those disagreements. It reviewed the medical records, and it made a factual determination that the MDC had taken the defendant to the hospital when necessary. That determination is entitled to deference, and it was supported by the record. Moreover, Your Honor, the medical conditions that he suffers from, he suffered from all of the same conditions when he perpetrated the charged offenses. There was no allegation that there was a new condition. Those conditions did not prevent him from traveling around the country. He went to Florida, New York, California. The district court cited that travel in the May determination as well, Your Honor. It didn't prevent him from doing any of that travel. And so those conditions simply don't have any bearing on the factors that the court considers in connection with the bail determination. They don't make him less likely to commit another fraud. He doesn't need to be. There is some bearing, but your argument is it didn't prevent him from traveling before, and so it doesn't overcome the risk of flight, is what you're saying. That's true, Your Honor. It's irrelevant. It obviously makes it less likely. And there could be a change in condition that could truly bear on bail. You know, if, for instance, he needed kidney dialysis, I think we can all acknowledge that that would be the sort of thing that would be difficult to get while you're on the lam, for instance. That's not what happened here. These are discrete events, discrete incidents where he was seen by a doctor and the doctors say, You're actually fine. And the test results that they do at the time bear that out. For instance, in October of 2021, when he says there was pepper spray on my unit and I can't breathe, he has 99% oxygen saturation. And so they say, You know what? You can breathe and you're speaking to me and you're fine. And so they've evaluated him. And that's what the medical records show. They show time and again he's brought an issue to the attention of the medical staff. They've reviewed it promptly. And they found, Oh, your heart rate is fine. You don't have any gallops or, you know, your blood pressure is stable. You don't need to go to the hospital right now. And he says forthrightly, and this is the basis for the motion, I disagree. They've also taken him to the hospital. He went to the hospital on October 14th for a cardiology workup. And it's the next day that he says he needs to go back to the hospital. So this isn't a case where the MDC has refused to take him where necessary. They've paid very close attention to this defendant. At one point on July 27th, they actually write in the medical records, This is a defendant who has a low threshold to admit to the hospital because of his conditions. They're conscientiously caring for this defendant. And that's what Judge Matsumoto found. Thank you very much, Mr. Axelrod. We'll turn it back to Ms. Cardi on rebuttal. Conscientiously caring for Mr. Sterrett is an abomination. They first take him to the hospital. He's told that he has to come back to the hospital for additional tests. They tell him that the tests are not authorized. They tell him, Go back to the facility and pretend you fainted, so maybe they'll take you back so the tests will be authorized. Forty-five days later, he gets to go back. I mean, yes, could there be a new condition? The new condition can very well be his death, and I'm not exaggerating that. There is proof after proof after proof that has come before this court in decision after decision after decision about the inadequate, abominable medical care at the Metropolitan Detention Center for people like Mr. Sterrett. So that, in and of itself, is of deep concern to me when the government tends to rely on Judge Matsumoto saying, Oh, he's being treated just fine. Unfortunately, I have had evidence that the medical community and the legal community at the Metropolitan Detention Center lie. So I do think that if that is an important issue, and I think it's an important issue, it should be an important issue, but I don't think it's one that the district court can so blithely say, Oh, everything is being taken care of. They have had internal, the chief judge has had to go to the Metropolitan Detention Center, in another case of mine, brought to this court and brought to the lower court because of the abominable medical care. So that cannot be. And in terms of, remember, at the lower court, the magistrate court, they found that he was not a risk of fight. Their concern was danger to the community. Well, there can't be danger to the community if he can't be on the Internet, he can't go out, he can't use a phone, then there is no danger to the community. And why should this man, I have many other security fraud cases, why should this man be in? And the other thing is that if there was money, he wouldn't have CJA counsel. And there is none. And the government has had years to prove whether or not there is some bucket of money out there that he can use to go to Costa Rica or buy a submarine. It's just not going to happen. This man is 65 years old and he should be out while he is fighting what is a very complex case. So I ask your honors to seriously consider this and what we presented in our papers. Thank you. Thank you very much, Ms. Carty. The case is submitted. And because that is the last argued case on our calendar for today, we are adjourned. Court is adjourned. Court is adjourned.